1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10   ANNA MARIE SIBALA,                    Civil         10cv1964-JLS (CAB)
                                            No.
11                              Plaintiff,
                                            **REPORT AND**
12        v.                                **RECOMMENDATION TO DENY**
                                            **PLAINTIFF'S MOTION FOR**
13                                          **SUMMARY JUDGMENT AND**
     MICHAEL J. ASTRUE,                     **GRANT DEFENDANT'S MOTION**
14                                          **FOR SUMMARY JUDGMENT**
                                Defendant.  **[Doc. Nos. 11 and 16]**
15

16                          I.  INTRODUCTION

17        Plaintiff Anna Maria Sibala ("Plaintiff") brings this action pursuant to the Social

18   Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

19   Commissioner of the Social Security Administration (the Commissioner).  The

20   Commissioner denied Plaintiff's application for disability benefits.  Plaintiff has filed a

21   motion for summary judgment. [Doc. No. 11.] In that motion, Plaintiff argues she should

22   have been found "disabled" under the Act and that the Appeals Council's decision adopting

23   Administrative Law Judge ("ALJ") Eve B. Godfrey's decision of April 23, 2010, denying her

24   benefits should be reversed because the ALJ's decision is not supported by substantial

25   evidence and is based on legal error.  The Commissioner has filed a cross motion for

26   summary judgment. [Doc. No. 16.] In that motion, the Commissioner argues the ALJ's

27   decision is supported by substantial evidence and is not based on legal error.

28        Pursuant to Southern District of California Local Civil Rule 7.1(d)(1), the Court finds

these motions may be decided on the papers and that no oral argument is necessary.  After careful consideration of the papers, the administrative record, and the applicable law, this Court recommends the ALJ's decision be **AFFIRMED**, Plaintiff's motion for summary judgment be **DENIED**, and the Commissioner's cross-motion for summary judgment be **GRANTED**.

## II.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on August 12, 2008. [Administrative Record ("AR") at 134-137.] Plaintiff alleged disability as of July 1, 2004 due to bipolar disorder. Id.  On October 9, 2008, the Social Security Administration ("Administration") determined that Plaintiff was not disabled from the period of July 1, 2004 to June 30, 2009, her date last insured ("DLI"),[1] and denied her benefits. [AR 79-83.] Plaintiff requested reconsideration of her application, and the Administration denied benefits again after reconsideration. [AR 85-89.] On March 23, 2009, Plaintiff requested an administrative hearing before an ALJ. [AR 96-97.]

On February 17, 2010, the ALJ conducted a hearing to consider the merits of Plaintiff's application. [AR 12-61.] This hearing resulted in her application being denied by the ALJ in a written decision dated April 23, 2010. [AR 67-74.] Plaintiff disagreed with the ALJ's decision, and on May 7, 2010, she requested an Appeals Council Review of the decision. [AR 7-8.] On July 28, 2010, the Appeals Council found there was no basis for granting Plaintiff's request for review and affirmed the ALJ's decision, which became the final decision of the Commissioner. [AR 1-3.]

On September 21, 2010, after having exhausted all administrative remedies, Plaintiff initiated this action seeking judicial review of the ALJ's decision. [Doc. No. 1.] On November 23, 2010, the Commissioner filed an answer to Plaintiff's complaint and lodged

---

[1]  To be entitled to disability insurance benefits, Plaintiff "must establish that [her] disability existed on or before" the date her insured status expired. Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998); see also Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1460 (9th Cir. 1995) (social security statutory scheme requires disability to be continuously disabling from time of onset during insured status to time of application for benefits, if individual applies for benefits for current disability after expiration of insured status).  In this case, Plaintiff's date last insured was June 30, 2009.

the Administrative Record. [Doc. Nos. 7 and 8.] On December 1, 2010, District Judge Janis

L. Sammartino referred all matters in this action to Magistrate Judge Cathy Ann Bencivengo

for a report and recommendation. [Doc. No. 9.] On January 24, 2011, Plaintiff filed her

motion for summary judgment, requesting that the Court reverse the ALJ's decision and

remand for payment of benefits or, in the alternative, remand for a new hearing. [Doc. No.

11.] On February 22, 2011, Defendant filed an opposition to plaintiff's motion [Doc. No. 14],

as well as his cross-motion for summary judgment [Doc. No. 16], requesting that the ALJ's

decision be affirmed.  On March 7, 2011, Plaintiff filed a reply to defendant's opposition.

[Doc. No. 17.]

### III.  FACTUAL BACKGROUND

**A.  Administrative Hearing**

An administrative hearing was held on February 17, 2010. [AR 12-61.] Plaintiff

testified at the hearing [AR 19-37], as did Alfred G. Jonas, MD, a psychiatrist [AR 37-57],

and vocational expert Gloria Lasoff [AR 57 - 61].  Plaintiff was represented by attorney

Melissa Dushay at the hearing. [AR 12.]

**B.  Medical Evidence in the Record**

1.  Patricia Heras, Ph.D.

Treatment notes from Patricia Heras, Ph.D., a treating psychologist, indicate that she

saw Plaintiff eight times between July 20, 2004 and October 6, 2004. [AR 258.] She was

diagnosed with bipolar disorder (depressed). [AR 263.] Dr. Heras released Plaintiff to return

to work as of October 30, 2004. [AR 263.]

2.  Dr. Young Ho Kang, M.D.

Plaintiff was seen for a psychiatric assessment by Dr. Kang, a staff psychiatrist at

County Mental Health, on July 28, 2005. [AR 281-281.] According to Dr. Kang, Plaintiff

was there because she wanted to get a refill on her Zoloft and valproic acid. [AR 282.] Dr.

Kang summarized the history of her present illness as follows:

> She has been on valproic acid for quite a while, but Zoloft was just started a
> month ago.  She could not see the psychiatrist any longer because of her
> running out of insurance policy.  She has lost her job two years ago, but the
> COBRA lasted until a month ago.  She currently lives at her mother's place

with her two children, a 1-1/2-year-old son and a 6-month-old daughter, separated from her husband for some time.  She is therefore going through marital turmoil and  - - - - - - to her.  Zoloft 50 mg a day has not been quite effective.

She was here in 1996 and was prescribed Telefon and Depakote.  She has an appointment with a Dr. Papp at South Bay Outpatient Psychiatric Clinic toward the end of August.

[AR 282.]

Dr. Kang then summarized his mental status examination of Plaintiff:

This is a 34-year-old female who is alert, coherent and fully oriented with appropriately anxious and depressed mood, but no suicidal thought or homicidal ideation.  Intelligence is average.  No hallucinations, paranoia or suspiciousness.  Speech is clear, logical and goal directed.  She is serious but sincere, cooperative and friendly.  Clothing and grooming are appropriate.  Sensorium is full with no confusion.  Thought process is intact with no looseness.

[AR 283.]

Dr. Kang diagnosed Plaintiff with bipolar disorder (not otherwise specified) and prescribed a higher dosage of Zoloft and the same dosage of valproic acid for 30 days plus one refill.  He also noted that Plaintiff was to see Dr. Papp on August 30, 2005. [AR 283.]

3.  Alexander Papp, M.D.

The earliest record of Plaintiff being seen by Dr. Papp, a psychiatrist at South Bay Guidance Center, is August 16, 2007. [AR 279.][2] At that time, Dr. Papp stated that Plaintiff's "target symptoms" were "mood swings, depression." [AR 279.] Dr. Papp then described the "effect of medication" and "M.S.E. [Mental Status Examination]" as follows:

Effect of Medication/Interventions/Level of functioning/Medication education: [Patient] says she has stopped taking Zoloft because "it was hard to open the bottle."  No downturn in mood has been noted.  Continues her therapy (DBT) because she has "no choice" (psychologically speaking).  She continues to struggle with stressors involving her children, estranged husband and her mother.  Still looking for Toastmasters locations.
M.S.E.
Alert, oriented x3; speech: clear, goal directed; PMA: WNL; AIMs: none, relatedness: good; appearance: casual, clean; attention: good; mood: "good"; affect: FR, very slightly labile; hallucinations: none; delusions: none; thought process: linear; s/h ideation: denied; insight: good; reality testing: intact.

[AR 279.]

Dr. Papp then diagnosed "Bipolar disorder in fair remission.  Ongoing interpersonal

---

[2] This may not have been the first time Dr. Papp saw Plaintiff, because the treatment record from August 16, 2007 states "[Patient] is seen for scheduled follow-up psych visit." [AR 279.]

stressors." [AR 279.] He instructed Plaintiff to "continue Depakote – resume the Zoloft if depression sets in." [AR 279.]

Plaintiff then treated with Dr. Papp on 10/11/07, 12/6/07, 1/31/08, 3/13/08, 5/8/08, 7/24/08.  The M.S.E., impression (diagnosis) and plan for all of those visits were very similar to the 8/16/07 visit. [AR 273-278.] On July 24, 2008, Dr. Papp reported:

> Pt reports feeling reasonably well.  She has trouble sleeping but she knows why – she drinks too much caffeine.  Continues to work on her book, attends school, raises her children.  Significant marital conflict with her husband continues.  Pt feels anxious a lot, no significant depressive sxs.  She uses the DBT group to her advantage, she is using her "wise mind".

[AR 273.]

Dr. Papp again diagnosed Plaintiff as having "bipolar disorder in fair remission." [AR 273.]

Dr. Papp next saw Plaintiff on December 4, 2008. [AR 306.] He described her symptoms as follows:

> 36 y/o F with psychiatric sxs encompassing symptoms of both rapid cycling bipolar disorder and anxiety.  Most of the sxs are under partial control allowing her to function periodically well, other times quite marginally.  Sleep is a problem mostly because of difficulty falling asleep.  She feels easily overwhelmed and has an unstable affect, cries and laughs easily.  Concentration is poor, loses the thread of conversation a few times during the day.  Continues to work on her children's book, attends school, raises children.  Significant marital conflict with her husband continues.  No significant depressive sxs.  She uses the DBT group to her advantage, she is using her "wise mind".

[AR 306.]

Dr. Papp summarized the M.S.E. as follows:

> Alert, oriented x3; speech:clear, goal directed, somewhat verbose; PMA: WNL; relatedness: good; appearance: casual, clean; attention: distractible; mood: "nervous," affect: somewhat labile, at times tearful; hallucinations: none; delusions: none; thought process: linear; s/h ideation: denied; insight: good; reality testing: intact.

[AR 306.]

Dr. Papp's diagnosis was "[b]ipolar disorder, rapid cycling, in partial remission.  Ongoing interpersonal stressors." [AR 306.]

Plaintiff then treated with Dr. Papp on 1/29/09, 3/26/09, 5/21/09, 7/16/09, 9/17/09, 11/12/09 and 1/7/10. [AR 317-323, 346-347.]  The M.S.E., impression (diagnosis) and plan

1   for all of those visits was very similar to the 12/4/08 visit. [AR 317-323.][3]

2        On July 2, 2009, Dr. Papp wrote a letter to Plaintiff's attorneys which stated the

3   following:

> Ms. Sibala has been suffering from Bipolar Disorder, Type II, rapid cycling, since the mid 1990s. Her first hospitalization occurred on October 23, 1996. She was able to work between 1997 and 2002. After her first pregnancy, in 2003, her symptoms have returned and have been active ever since. They consist of unstable mood and affect, easy distractibility, anxiety, irritability, erratic sleep and depression that prevent her from being gainfully employed for at least a year.

> This letter is written upon Ms. Sibala's request and was handed over to her so as to be used in any way she sees it fit.

[AR 363.]

       **4. R. Paxton, M.D.**

       Dr. Paxton is a State Agency consulting physician. He reviewed Plaintiff's medical records on October 9, 2008. [AR 304-305.] Dr. Paxton found that there were inconsistencies between the reports and the allegations. He found Plaintiff's credibility to be partially credible as to symptoms but not as to severity. Dr. Paxton further stated:

> Record shows that claimant's condition is stable. MER in file is consistent with her fully functional ADL.
> Recommend non-severe
> Listing 12.04 is considered.

[AR 305.]

       **5. K.J. Loomis, DO, Psychiatrist.**

       Dr. Loomis is a State Agency consulting physician. He reviewed Plaintiff's medical records on January 23, 2009. [AR 313-314.] Dr. Loomis agreed with Dr. Paxton's prior decision. [AR 313.]

       **6. Yaron Pruginin, Psy.D.**

       Dr. Pruginin treated Plaintiff biweekly from July 2, 2009 through January 14, 2010 for generalized bipolar disorder. [AR 339.] In his form report, Dr. Pruginin checked off the following clinical findings to support his diagnosis: mood disturbance; emotional liability; psychomotor agitation; oddities of thought, perception, speech or behavior; social withdrawal

---

[3] A Mental Health Assessment update was conducted at the South Bay Guidance Center on October 9, 2009, by Ken Dellerfield, Ph.D. (Clinical Supervisor) and Judy Lamb, MA (Psychological Intern). She was again assessed with bipolar disorder NOS. [AR 348-350.]

or isolation; generalized persistent anxiety; hostility and irritability. [AR 340.] He then listed the following as the clinical findings/symptoms that were the more frequent or severe: "Agitation, tangential thought process, anger management problems, labial mood." [AR 341.]

At this point, the copy of Dr. Pruginin's report that is contained within the administrative record is incomplete. It appears that pages 5 and 7 of an 8-page report have been omitted. [See AR 342 - 344.] From what is available, Dr. Pruginin lists the following mental activities as being markedly limited (and thus affecting the individual's ability to work): the ability to carry out detailed instructions; the ability to work in coordination with or proximity to others without being distracted by them; the ability to set realistic goals or make plans independently. [AR 342-343.] The last page of the report indicates that Plaintiff is estimated to be absent from work as a result of her impairments more than three times per month. [AR 344.]

## C. Testimony at Administrative Hearing.

### 1. Testimony of Plaintiff

Plaintiff testified in pertinent part as follows:

Q.    Ms. Sibala, how old are you?
A.    39
Q.    39. And when did you last work?
A.    December 20, 2002.
. . .
Q.    Now what kind of education do you have?
A.    A Bachelors degree in Cultural Anthropology.
Q.    And where did you get that?
A.    San Diego State University.
Q.    All right. And when did you get that?
A.    Graduated May '94.
Q.    '94. All right. And so what have you been doing since then?
A.    I worked for a year after my college graduation so I could go [sic] the Philippines for awhile to research my family tree. Then I came back, and then that's when I, had my first manic episode.
Q.    So that was back in '95? Have you had any treatment before then?
A.    No.
Q.    All right. What was your next job?
A.    Prudential, and then they were taking [sic] over by Aetna.
Q.    And what did you do for them?
A.    I started off as a data entry, and then we moved over to quality review and then to finally cost mat, the overpayment department.
Q.    Say that again. What department?
A.    Overpayment department, collecting money back, which was overpaid –

- 7 -

```
1    Q.   Oh.
     A.   – to the doctors and members, clients.
2    Q.   I bet you dealt with some very unhappy people there.
     A.   Yeah.
3    Q.   All right.  And then how long did you, I have a note that you did that, or
          you worked for them unitl '03, early '03?
4    A.   Wrong.  It was technically December [of '02], but they had a package.
          But on the books it wasn't until March.  They had a layoff package that
5         technically we were still working.  We're still on the books as employee,
          because they, we had like eight weeks or so paid.
6    Q.   Okay.  Now –
     A.   But we weren't working.
7    Q.   – I see you were –
     A.   I'm sorry.
8    Q.   – also worked at a photo lab?  That was in '95?
     A.   Oh yeah.  I forgot about that.  Sorry.
9    Q.   And what did you do at the photo lab?
     A.   I just developed pictures under an hour.
10   . . .
     Q.   And how many children do you have?
11   A.   Two.
     Q.   And how old are they?
12   A.   Five and six.
     Q.   Five and six?  And do you live with your children?
13   A.   Yes.
     Q.   Does anybody else live with you?
14   A.   Right now, I've, I've always lived with my mother.  Then a year ago my
          niece moved in.  And just a month ago, my brother, his wife, and three
15        more kids and dog moved in.
     Q.   Wait a second.  Wait.  Your mother –
16   A.   Sorry.
     Q.   – your niece, your brother, his wife and his two kids?
17   A.   Three.  One year ago my niece came in, who's a 19-year-old.  And then
          just a month ago they moved in temporarily.  They said they're going to
18        come in for about six months.  But it's, my brother, I'm sorry.
     Q.   All right.  And what is the expectation with respect to your mother and
19        your niece?  You said they came a year ago.  Do they have any time that
          they're going to leave, or did they plan on permanently staying with
20        you?
     A.   Oh no.  I've always lived with my mother since June 2004.  I moved
21        into her house, and then my niece –
     Q.   Oh.
22   A.   – came in a year ago.
     Q.   Okay.  All right.  Now how do you spend your days?
23   A.   I take my daughter to school in the morning, and my son.  I pick up my
          daughter at 10:00, because she goes to a different school than my son.
24        And then I pick up my son.  And I do –
     Q.   What time do you pick up your son?
25   A.   At 2:15.
     Q    So what do you do between 10:00 and 2:15?
26   A.   I do chores, or also errands, you know, buying food.
     Q.   Okay.  What does your daughter do while you're doing chores and
27        errands?
     A.   My mom takes care of my daughter during the time I do errands by
28        myself.
     Q.   Do you run the errands for your mother, too?
```

- 8 -

| | | |
|---|---|---|
| 1 | A. | No. |
| | Q. | She doesn't ask you to do things for her? |
| 2 | A. | Once in a blue moon.  She's still very active. |
| | Q. | Okay.  Do you drive? |
| 3 | A. | Yes, Your Honor. |
| | Q. | All right.  So then you come home after your errands.  And then you |
| 4 | | have lunch with your daughter? |
| | A. | Yes.  Or, I'll take her to a park sometimes.  Well just recently my son |
| 5 | | was going to another school in San Diego.  And I, it was too far.  So, |
| | | just after Christmas I moved him to a closer school to lower our stress |
| 6 | | levels. |
| | Q. | Okay. |
| 7 | A. | So that was a stress.  I was trying to take him to [an] alternative charter |
| | | school with project-based learning, because they don't have [that] in |
| 8 | | Chula Vista.  So, but it didn't work out because it was so far away. |
| | Q. | So you then drive to your son's school – |
| 9 | A. | With – |
| | Q. | – at 2:15 to pick him up? |
| 10 | A. | Yes. |
| | Q. | And then what do you do after that? |
| 11 | A. | Then I let them play in the back yard or do homework with my son. |
| | Q. | Do you have to pack a lunch for your son to take to school? |
| 12 | A. | I used to, but we just got approved for reduced lunch, so now I only |
| | | pack a snack. |
| 13 | Q. | Okay. So he has homework that you help him with? |
| | A. | Yes. |
| 14 | Q. | All right then what do you do? |
| | A. | It just seems I clean a lot. |
| 15 | Q. | And then how about meals and bathing and? |
| | A. | Oh I bathe the children, or I let them bathe themselves.  And I help out |
| 16 | | with the shampooing because they don't do it well enough sometimes. |
| | Q. | Qkay.  Who cooks dinner? |
| 17 | A. | Pretty much it's frozen food.  But once in, once in a while when I get a |
| | | lot of energy, or I'm in the mood, I'll cook.  But pretty much it's quick |
| 18 | | like cereal or frozen food or, they like Nutella.  So I do sandwiches with |
| | | Nutella. |
| 19 | | . . . |
| | Q. | Okay.  Now do you use a computer? |
| 20 | A. | Yes. |
| | Q. | What do you do with your computer? |
| 21 | A. | Email once in a while.  I'm not much of an emailer, though.  But surf |
| | | the Net once in a while.  I'm not really, I don't like to sit in front of the |
| 22 | | computer and load, load in my pictures.  That's pretty much it. |
| | Q. | You don't have a Facebook page or anything like that? |
| 23 | A. | I don't have time for Facebook.  Sorry.  And I'm not very good |
| | | technically to navigate through – |
| 24 | Q. | Do you have – |
| | A. | – computers – |
| 25 | Q. | – any hobbies? |
| | A. | I watch reality TV shows to relax, American Idol. |
| 26 | Q. | How about activities with your niece or your mother?  On the weekends |
| | | do you do anything with them? |
| 27 | A. | Once.  Only on, we only celebrate like birthdays, Thanksgiving.  We |
| | | don't really have, because I don't really get along with my mother. |
| 28 | Q. | Okay.  Well on the weekends what do you do with your kids? |
| | A. | It's like very erratic. |

| | | |
|---|---|---|
| 1 | Q. | Uh-huh. |
| | A. | Yeah.  I try to make, take them to the park. |
| 2 | Q. | What do they like to do there? |
| | A. | To the playground.  And my son likes soccer and baseball.  He's going |
| 3 | | to play tee ball soon.  And my daughter has ballet.  But I'm – |
| | Q. | Is it ballet? |
| 4 | A. | Ballet at the recreation center, though.  Not at a, at a nice studio.  But |
| | | I'm taking a break from ballet, and then my son is going to do tee ball |
| 5 | | soon.  So that's what we did for a while.  And there was a break during |
| | | the holidays.  And then I'm waiting for the next activity for my son. |
| 6 | Q. | Okay.  Do you do any religious activites? |
| | A. | I used to go to prayer group on Thursday nights. |
| 7 | Q. | When did you stop doing that? |
| | A. | I stopped when, and then I went back again, and then I stopped again. |
| 8 | Q. | So you go intermittently to prayer group?  Is that an accurate statement? |
| | A. | Yes.  I'm wanting to go back but then, something came up again on |
| 9 | | Thursday. |

[AR 19-32.]

2.  Testimony of Alfred G. Jonas, MD.

Dr. Jonas, a psychiatrist, reviewed the above medical records and testified at the ALJ

hearing, in pertinent part, as follows:

| | | |
|---|---|---|
| | Q: | All right, Doctor. |
| | A: | Okay.  What we have, it's a little bit complicated.  There are, |
| | | there's some issue [sic] that are referable to 12.04.  The |
| | | consistent diagnosis here is bipolar disorder, and there's |
| | | indications both of the manic phases and the depressive phases, |
| | | enough so that I think it's probably reasonable to confirm 12.04 |
| | | in the A Criteria.  And that would be 12.04(2) and 12.04(1).  We |
| | | have a little clearer view if we had that '96 hospital record.  But I |
| | | think the record is enough, at least to be strongly suggestive of |
| | | 12.04.  The other, other possible issue here because of the |
| | | ongoing instability and due to personal difficulty, things like that |
| | | is the possibility of 12.08.  That, that diagnosis was considered by |
| | | Dr. Kang, in 3 F, but left deferred, which is to say Dr. Kang |
| | | though [sic] about whether Ms. Sibala might have a personality |
| | | disorder and couldn't really decide whether she did or she didn't, |
| | | so left it as deferred.  I think there's probably enough in this |
| | | record, at least to be suggestive that there could be some form of |
| | | personality disorder, and again thinking about some of the |
| | | interpersonal distortions.  So 12.04 then and 12.08.  In terms of |
| | | the B Criteria, I don't have much information in this record about |
| | | ADLs.  There just isn't really much to describe them at all.  It |
| | | sounds from the personal testimony as if Ms. Sibala is roughly |
| | | adequately functional, and at least somewhat independent.  So I |
| | | would say that we may be looking at no impairment, but perhaps |
| | | a mild degree of impairments.  But I don't see anything in the |
| | | record, or hear anything in the personal testimony to suggest any |
| | | more than that.  In terms of maintenance of appropriate social |
| | | functioning, that seems to be somewhat more considerably |
| | | impaired.  And I would say that we would be looking at least |
| | | from time to time, if not often, at a listing level or [sic] marked. |
| | | With respect to concentration, persistence and pace, again, |

| | | |
|---|---|---|
| 1 | | there's not much in the record.  There is a normal mental state |
| 2 | | examination back in 3F.  There really isn't much else.  Listening to the personal testimony, I'm sort of not impressed that there's a great deal of impairments in, in concentration, persistence and |
| 3 | | pace.  7F contains a note from December 4th of '08 that talks about unstable functioning and impaired concentration.  Says that |
| 4 | | she is continuing to write a childrens book and go to school, and taking care of her children, and experiencing marital conflict. |
| 5 | | And 2F page 12, from December 6th of '07, says that she had finished writing one of the childrens books that she was working |
| 6 | | on, but she lost it in the clutter of her home environment, which is suggestive of some possible impairments in concentration, |
| 7 | | persistence and pace.  So the record is a little bit unclear.  And it may be that we would be looking at some degree of impairment, |
| 8 | | but I don't think there's anything to suggest that it would be much.  So I would say certainly not more than moderate and |
| 9 | | probably not more than mild.  With respect to deterioration of functional settings, pretty hard to tell from this record, especially |
| 10 | | thinking of an alleged onset date of July -07, when there really hasn't been much in terms of effort or ambition in a functional |
| 11 | | direction.  And I, I don't know, and again thinking about the sort of preference for child rearing and taking care of the home, |
| 12 | | possibly to the exclusion of some other thing, I don't know that we really could identify from this record anything that could be |
| 13 | | called an episode of deterioration of a functional setting.  The alternative is to imagine that Ms. Sibala is so impaired in this |
| 14 | | way, that she is essentially continuously deteriorated and couldn't even make an attempt to try a functional setting.  And I don't |
| 15 | | think the record really gives us that kind of a view of her.  So, I, I would either live [sic] item four unanalyzed because of a lack of |
| 16 | | good enough information, or to say that there are not identifiable episodes. |
| 17 | Q. | Okay.  What about limitations for work? |
| | A. | Well I think the main ones would be social, and, and would |
| 18 | | probably suggest, and even thinking about her appearance in the hearing today with some affective fragility that we, we really |
| 19 | | would not see her as somebody who would do well dealing with the general public, and maybe even not doing well dealing with a |
| 20 | | collection of co-workers, if an important part of the task was to interact with co-workers.  I think she could probably manage a |
| 21 | | task where other people were, and she was doing her job, and they were doing theirs and maybe just occasional and casual |
| 22 | | interaction.  But I think the more interpersonal activity the worse for her.  And apart from that, I, I don't really see anything that |
| 23 | | would translate into a meaningful restriction for her. |
| 24 | . . . . | |
| 25 | Q. | Well thinking about this medication that she's been on for, or was prescribed for so many years.  So as we know she didn't take |
| 26 | | it during her pregnancy. |
| | A. | Right. |
| 27 | Q. | Is that surprising that she would have this fragility that you referenced after so many years on the same medication, or does |
| 28 | | that suggest that there should be perhaps a change of medication, or did you see anything in the records that would reflect why |

there's no change in medication?

A.  It, it, it's sort of, I mean it's very complicated, the question you're asking.  But it sort of depends upon what anybody thinks is the cause of the fragility is [sic].  If, if we looked at this Harris note of September of '04, she's describing Ms. Sibala as very depressed, tearful, etcetera, sleeping abnormally, and you would think that either Dr. Harris or the prescribing psychiatrist would somehow interpret this to mean that Ms. Sibala is clinically depressed.  And if they thought that, then ideally they would either, well not they, it's just the psychiatrist, would, would prescribe an antidepressant, or if one was already prescribed, then either change the dose, or if the dose is maximal for that medication, then find another one for something, if you think that, that the diagnosis, or the dynamic is clinical depression.  On the other hand, if you think it's a form of personality disorder, which may include affective instability, then some psychiatrist [sic] would treat that with, with medication anyway, and some of them will not based on the understanding that if it's a personality disorder, and not one of those other clinical syndromes, like depression, then medication is not going to help.  And it's just a matter of the philosophy of the psychiatrist.  Some - -

Q.  All right.  I'm sorry.  Go ahead.

A.  Go ahead.

Q.  No, I thought you were finished, but.

A.  I was just going to say that some psychiatrist [sic] will treat essentially symptoms within a personality disorder with medication as if those symptoms represented the other clinical syndrome, and some of them will not.

Q.  Well we know now that her second child was born in January '05.  So, - -

A.  Okay.

Q.  – basically at four years of the same medication of Depakote and Zoloft.  But from the notes or the medical statements of these treaters, it doesn't suggest that these things have been successfully treated.

A.  And do I remember that the dose of the Zoloft was 100 milligrams per day?

Q.  Yes.

A.  Okay.  You know I can't, I can't answer for the prescriber in this case.  The prescriber would have to answer for him or herself.  But I will tell you that if the prescriber is prescribing Zoloft, then we should imagine that the prescriber thinks that he or she is treating depression.  100 milligrams of Zoloft is fairly lowish [phonetic] dose.  Most prescribers who want to use Zoloft will not feel at all shy about prescribing up to 200 or 250 milligrams a day, and some of them go up into the few 100 or even several 100 a day.  Not common, but it happens.  So, so we have sort of an unambitious approach to the, to the problem here.

Q.  Well is there anything in the record that would suggest why there was no change in medication?

A.  No.

[AR 43-51.]

3.  Testimony of Gloria Lasoff.

Ms. Lasoff is a vocational expert.  She testified at the ALJ hearing in pertinent part as

follows:

Q.   All right.  Well, using the doctor's hypothetical which is a job with no public contact, minimal contact with others, and specifically not having to work in a team, so she has to work in conjunction with any other person, and simple unskilled work.  Could she do any of the past relevant work?

A.   No.

Q.   Other jobs?

A.   Yes, Your Honor.

Q.   Can you please give me some examples?

A.   Sure.  One example would be a laundry laborer.  The DOT is 361.687-018, and that's SVP of two, medium.  And San Diego approximately 2,000, nationally 400,000.  A light example would be production assembler, 706.687-010, SVP of two, light.  San Diego approximately 2,000, nationally 400,000.  And another example would be general laborer.  And that's 754.687-010, SVP of two, medium.  San Diego approximately 500, nationally 75,000.

Q.   Can you give me an example of a sedentary job?

A.   Sure.  An example would be an assembler, 559.687-014.  Numbers in San Diego approximately 800, nationally 100,000.

Q.   Okay.  All right.  The next hypothetical is based on 13F.  Okay.  Using the definition of moderately limited as significantly affects, but does not totally preclude the individual's ability to perform the activity.  And marked as effectively precludes the individual from performing the activity in a meaningful manner.  The following are markedly limited.  Ability to carry out detailed instructions, ability to work in coordination with or proximity to others without being distracted by them, ability to set realistic goals or make plans independently, moderately limited are the ability to be aware of normal hazards and take appropriate precautions.  Ability to perform within a schedule, maintain regular attendance and be punctual within customary tolerance, carry out simple one- or two- step instructions, and the ability to remember locations and work-like procedures. . . . . . Would such an individual be able to do any of the past relevant work?

A.   Not with any, no Your Honor.  Not at all.

Q.   Any other work?

A.   Not with continuity.

[AR 57-60.]

## C. The ALJ's findings

After a discussion of the evidence in the record, the ALJ determined that Plaintiff was not entitled to SSDI benefits during the insured period of July 1, 2004 through June 30, 2009.  [AR 74.] In making her determination, the ALJ found that Plaintiff had the following severe impairment: bipolar disorder (20 CFR 404.1520(c)).  Despite this impairment, the ALJ found that Plaintiff had "the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with the following nonexertional limitations: limitation to performing

simple repetitive tasks in a non-public environment requiring minimal contact with others."

[AR 71-72.] The ALJ explained her RFC analysis as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> As for the opinion evidence, Dr. Papp's opinions that the claimant's unstable mood, easy distractibility and anxiety preclude work activity (Exhibits 12F and 15 F), are inconsistent with his records which consistently show the claimant with diagnoses described as in "fair remission" or "partial remission". Dr. Papp stated the claimant's symptoms returned after her first pregnancy and that they had continued since that time (Exhibit 15F, Page 2). It is significant to note the claimant's testimony that she did not take prescribed medication from the time of her first pregnancy through the birth of her second child. Further, the medical expert noted the claimant to be taking a low dose of Zoloft. The claimant's level of medication was inconsistent with Dr. Papp's opinions of her impairment level.
>
> Similarly, the record offers no specific evidence to support Dr. Pruginin's opinion that the claimant would experience episodes of deterioration or decompensation in work or work like settings where she performed simple repetitive tasks in a non-public environment requiring minimal contact with others. Nor does the record support Dr. Pruginin's estimate that the claimant would likely be absent from such work more than three times per month due to her impairment (Exhibit 13F, Pages 7-8).
>
> In terms of the claimant's alleged impairment, the undersigned finds that the claimant did not follow prescribed treatment from the time of her first pregnancy through birth of second child. Additionally, the claimant's daily activities include caring for children, attending school and writing children's books [and] establish a level of functioning greater than that alleged by her. Further, the claimant unfortunately lives in a household with several other people in a situation where interpersonal conflict is inevitable and where such conflict is not demonstrative of an impairment precluding a residual functional capacity as found above by the undersigned.
>
> In sum, the above residual functioanl capacity assessment is supported by the totality of the evidence within the claimant's longitudinal medical record.

[AR 72-73.]

Finally, the ALJ determined that, while the Plaintiff could not perform any past relevant work [AR 73], there were jobs that existed in significant numbers in the national economy that the claimant could have performed:

> Through the date last insured, the claimant's ability to perform work at all exertional levels was compromised by nonexertional limitations. To determine the extent to which these limitations eroded the occupational base of unskilled work at all exertional levels, the Administrative Law Judge asked the vocational expert whether jobs existed in the national economy for an

individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would have been able to perform the requirements of representative occupations existing in numbers shown for the regional and national economy, such as: laundry laborer (DOT 361.687-018) 2,000/400,000; product assembler (DOT 706.687-010) 2,000/400,000; general laborer (DOT 754.687-010) 500/75,000; assembler (DOT 559.687.014) 800/100,000.

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines.

[AR 73-74.]

As a result, the ALJ found that Plaintiff was "not disabled" within the meaning of the Act. [AR 74.]

IV.  DISCUSSION

**A.  Legal Standard**

The Social Security Act authorizes payment of SSDI benefits to individuals who have an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The disabling impairment must be so severe that the claimant is not only unable to do his previous work, but, considering age, education, and work experience, cannot engage in any kind of substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The Commissioner makes this assessment by a five-step analysis. First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). Second, the Commissioner determines whether the claimant has a "severe impairment or combination of impairments" that significantly limits the claimant's physical or mental ability to do basic work activities. If not, the claimant is not disabled. 20 C.F.R. § 404.1520(c). Third, the medical evidence of

the claimant's impairment is compared to a list of impairments that are presumed severe

enough to preclude work; if the claimant's impairment meets or equals one of the listed

impairments, benefits are awarded.  20 C.F.R. § 404.1520(d).  Fourth, if the impairment

meets or equals one of the listed impairments, the Commissioner determines whether the

claimant can do his past relevant work.  If the claimant can do his past work, benefits are

denied.  20 C.F.R. § 404.1520(e).  If the claimant cannot perform his past relevant work, the

burden shifts to the Commissioner.  In step five, the Commissioner must establish that the

claimant can perform other work.  20 C.F.R. § 404.1520(f).  If the Commissioner meets this

burden and proves that the claimant is able to perform other work that exists in the national

economy, then benefits are denied.

Sections 405(g) and 421(d) of the Social Security Act allow unsuccessful applicants to

seek judicial review of a final agency decision of the Commissioner.  42 U.S.C. §§ 405(g),

421(d).  The scope of judicial review is limited, however, and the Commissioner's denial of

benefits "will be disturbed only if it is not supported by substantial evidence or is based on

legal error."  Brawner v. Sec'y of Health & Human Servs., 839 F.2d 432, 433 (9th Cir. 1988)

(citing Green v. Heckler, 803 F.2d 528, 529 (9th Cir. 1986)).

Substantial evidence means "more than a mere scintilla" but less than a

preponderance.  Sandqathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997).  "[I]t is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.

(quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).  The court must consider

the record as a whole, weighing both the evidence that supports and detracts from the

Commissioner's conclusions.  Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573,

576 (9th Cir. 1988).  If the evidence supports more than one rational interpretation, the court

must uphold the ALJ's decision.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  When

the evidence is inconclusive, "questions of credibility and resolution of conflicts in the

testimony are functions solely of the Secretary."  Sample v. Schweiker, 694 F.2d 639, 642

(9th Cir. 1982).

The ALJ has a special duty in social security cases to fully and fairly develop the

record in order to make an informed decision on a claimant's entitlement to disability

benefits.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).  Because disability

hearings are not adversarial in nature, the ALJ must "inform himself about the facts relevant

to his decision," even if the claimant is represented by counsel.  Id. (quoting Heckler v.

Campbell, 461 U.S. 458, 471 n.1 (1983)).

Even if the reviewing court finds that substantial evidence supports the ALJ's

conclusions, the court must set aside the decision if the ALJ failed to apply the proper legal

standards in weighing the evidence and reaching his or her decision.  Benitez v. Califano,

573 F.2d 653, 655 (9th Cir. 1978).  Section 405(g) permits a court to enter a judgment

affirming, modifying, or reversing the Commissioner's decision.  42 U.S.C. § 405(g).  The

reviewing court may also remand the matter to the Commissioner for further proceedings.

Id.

**B.  Plaintiff's Claims**

Plaintiff asserts two grounds for reversal of the ALJ's decision.  First, she asserts that

the ALJ did not give clear and convincing reasons for rejecting the opinions of treating

psychiatrist Papp and treating psychologist Pruginin. [Doc. No. 11 at 12.] Second, Plaintiff

argues that there was insufficient evidence to support the ALJ's finding that Plaintiff's

subjective complaints were not credible. [AR 13-14.] The Court considers each of Plaintiff's

arguments below.

**1.  ALJ's rejection of Drs. Papp's and Pruginin's opinions.**

The Ninth Circuit distinguishes among the opinions of three types of physicians:  (1)

those who treat the claimant (treating physicians); (2) those who examine but do not treat the

claimant (examining physicians); and (3) those who neither examine nor treat the claimant

(nonexamining physicians).  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  The ALJ

must give the medical opinion of a treating physician "special weight," because a treating

physician "is employed to cure and has a greater opportunity to know and observe the patient

as an individual."  Andrews, 53 F.3d at 1041 (citation omitted); Rodriguez v. Bowen, 876

F.2d 759, 761 (9th Cir.1989).  However, the treating physician's opinion on the ultimate

1   issue of disability is not necessarily conclusive.  <u>Matney v. Sullivan</u>, 981 F.2d 1016, 1019

2   (9th Cir. 1992).  The ALJ may disregard the treating physician's opinion if the ALJ sets forth

3   "specific, legitimate reasons . . . based on substantial evidence."  <u>Rodriguez</u>, 876 F.2d at 762.

4   The ALJ can meet this burden of substantial evidence by "providing a detailed summary of

5   the facts and conflicting clinical evidence, along with a reasoned interpretation thereof."  <u>Id</u>.

6   Finally, the ALJ need not accept an opinion of a treating physician if it is "conclusionary and

7   brief and unsupported by clinical findings."  <u>Matney</u>, 981 F.2d at 1019.

8           Here, the ALJ did give "specific, legitimate reasons . . . based on substantial

9   evidence" for rejecting Dr. Papp's opinion.  <u>Rodriguez</u>, 876 F.2d at 762.  First, the ALJ noted

10  that "Dr. Papp's opinions that the claimant's unstable mood, easy distractibility and anxiety

11  preclude work activity (Exhibits 12F and 15 F), are inconsistent with his records which

12  consistently show the claimant with diagnoses described as in 'fair remission' or 'partial

13  remission.'" [AR 72.] Dr. Papp's treatment records consistently say that plaintiff's bipolar

14  disorder was in "fair remission"[4] or "partial remission." [AR 273-279, 306, 317-323, 346-

15  347, 351-353, 355, 361.] Moreover, Dr. Papp's treatment records also indicate that plaintiff

16  was consistently fully oriented, her thought processes intact, with good insights, clear speech,

17  and no hallucinations. [<u>Id.</u>]   Finally, Dr. Papp also noted that Plaintiff's daily activities were

18  reported to include working on a children's book, attending school and caring for her

19  children. [AR 306.] These records contradict Dr. Papp's conclusion that Plaintiff was

20  precluded from work activity.  An ALJ may discount a treating physician's opinion based on

21  inconsistency with the treatment notes. <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1216 (9th

22  Cir.2005).

23          Dr. Papp's conclusion is also inconsistent with Plaintiff's own testimony about her

24  daily activities.  Plaintiff testified that she drives her children to and from different schools

25  every day. [AR 27.] While the children are in school, Plaintiff does chores and runs errands,

26  such as buying food. [AR 27.] She takes her children to the park or to their various activities

27

28          [4] "Remission," in the medical context, is defined as "a temporary abatement of the symptoms of
     a disease."  <u>Webster's Third New International Dictionary</u> (3rd ed. 1993).

such as soccer, baseball and ballet. [AR 28, 31.] She helps her son with his homework, makes meals for her children, bathes them and puts them to bed. [AR 28-30.] She uses the computer for emailing, surfing the internet or loading pictures from her camera. [AR 30.] She has taken her children on a trip to Hawaii for her brother's wedding. [AR 34.] Plaintiff also attends a weekly prayer group intermittently [AR 32], and has written several children's books (although she has not published them). [AR 41-41.]  All of these activities are inconsistent with Dr. Papp's opinion that she is unable to work.   If the claimant's mental disorder does not seriously disrupt his/her daily life, social interaction, ability to care for his own needs, and his/her grooming, the claimant is not disabled. Goose v. Apfel, 238 F.3d 981, 983 (8th Cir. 2001); Benda v. Bowen, 851 F. Supp. 210 (N.D. Ill. 1988).  See also Pfeister v. Bowen, 673 F. Supp. 723 (W.D. Pa. 1987) (where claimant maintained his household, shopped for groceries, drove a car, walked his dog, read, cooked, and attended church, he did not show marked restrictions of activities).

The ALJ also noted that Dr. Papp's opinion about Plaintiff's inability to work was inconsistent with the level of medication (Zoloft) that he had prescribed. [AR 72.] As Dr. Jonas testified,[5] Plaintiff was taking a very low dose of Zoloft which, to Dr. Jonas, indicated an "unambitious approach" to Plaintiff's treatment. [AR 50, 72.]  Thus, it was inconsistent for Dr. Papp to opine that Plaintiff cannot work, yet at the same time prescribe a very low dose of medication.

Finally, the ALJ notes that Dr. Papp states that the Plaintiff's symptoms returned after her first pregnancy and that they continued since that time.  The ALJ then points out that Plaintiff testified that she stopped taking Zoloft from the time of her first pregnancy through the birth of her second child (which would have been in approximately 2003 - 2004). [AR 72.]  Plaintiff argues that this should not have been a basis for the ALJ to reject Dr. Papp's opinion, as Plaintiff should not be penalized for her reasonable decision to stop taking the medication during her pregnancies. [Doc. No. 11 at 11.]   Plaintiff is correct that failure to

---

[5] Andrews v. Shahala, 53 F.3d 1035, 1041 (9th Cir. 1995)(opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it.)

1  follow a prescribed treatment, when there is a good reason not to do so, may not be used as a

2  basis to deny disability benefits.  See  20 C.F.R. §404.1530(b); Orn v. Astrue, 495 F.3d 625,

3  638 (9th Cir. 2007).  It is unclear whether the ALJ was saying plaintiff should have taken

4  Zoloft during pregnancy (which would be improper) or was merely pointing out that Dr.

5  Papp failed to mention that plaintiff was not medicated for a period of time during her

6  pregnancies (thus lowering the credibility of Dr. Papp's opinion).[6]  However, even if the

7  ALJ did improperly reject Dr. Papp's opinion because plaintiff stopped taking her medication

8  during pregnancy, this was harmless error because of the other valid reasons given by the

9  ALJ for discrediting Dr. Papp's opinion.  See Batson v. Comm'r of Soc. Sec. Admin., 359

10  F.3d 1190, 1195-97 (9th Cir. 2004) (applying harmless error standard where one of the ALJ's

11  several reasons supporting an adverse credibility finding was held invalid).  Therefore,

12  reversal of the ALJ's rejection of Dr. Papp's opinion is not warranted.

13      The ALJ also gave  "specific, legitimate reasons . . . based on substantial evidence"

14  for rejecting Dr. Pruginin's opinion.  Rodriguez, 876 F.2d at 762.  First, Dr. Pruginin did not

15  begin treating Plaintiff until after her date last insured. [AR 339.]  Second, on its face Dr.

16  Pruginin's report is unimpressive.  It is a form report where items have either been checked

17  off or are handwritten into the form.  Moreover, pages 5 and 7 (out of 8) of the report are

18  missing.  It appears this is the way plaintiff submitted the report to the ALJ,[7] as the ALJ's

19  exhibit page numbers are sequential, while the page numbers on the original report are

20  _____

21      [6] Dr. Papp states that "[a]fter [plaintiff's] first pregnancy, in 2003, her symptoms have
returned and have been active ever since." [AR 363.] If plaintiff's failure to medicate during her

22  pregnancies worsened her symptoms, it seems Dr. Papp should have mentioned that fact (as
opposed to implying that her symptoms were unchanged during that entire time period).  If

23  plaintiff's failure to medicate during her pregnancies did not worsen her symptoms, then one has
to wonder about the effectiveness of the medication.  It is also unclear how Dr. Papp could opine

24  that Plaintiff has been unable to work since 2003, when the first record of Dr. Papp treating
plaintiff is four years later, in August 2007.  Finally, Dr. Papp fails to explain how Plaintiff could

25  have been unable to work since 2003, when Dr. Heras (who treated Plaintiff from July - October,
2004) stated that Plaintiff was released (or anticipated to be released) to work as of October 30,

26  2004 [AR 263], which was four months before the birth of Plaintiff's second child [AR 40].

27      [7] The claimant bears the burden of proving steps one through four of the five-step
analysis, consistent with the general rule that "[a]t all times, the burden is on the claimant to

28  establish [his] entitlement to disability benefits."  Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir.
1998).

1   missing pages 5 and 7. [AR 337-344.] As pointed out by the ALJ, on the pages that are

2   available, there is no specific evidence to back up Dr. Pruginin's boilerplate opinion that

3   plaintiff would "experience episodes of deterioration or decompensation in work or work like

4   settings which cause him/her to withdraw from that situation and/or experience exacerbation

5   of signs and symptoms." [AR 343.] There is also nothing in the incomplete form report to

6   back up Dr. Prugnin checking off the box that, on average, plaintiff was "likely to be absent

7   from work as a result of the impairments or treatment . . . [m]ore than three times a month."[8]

8   [AR 344.] When evaluating conflicting medical opinions, an ALJ need not accept the opinion

9   of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical

10  findings.  Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005), citing Tonapetyan v.

11  Halter, 242 F.3d 1144, 1149 (9th Cir.2001).  Therefore, the ALJ did not err in rejecting Dr.

12  Pruginin's opinion.

13         **2.  ALJ's finding that plaintiff's subjective complaints were not credible**.

14         "To determine whether a claimant's testimony regarding subjective pain or symptoms

15  is credible, an ALJ must engage in a two-step analysis." Lingenfelter v. Astrue, 504 F.3d

16  1028, 1035–36 (9th Cir.2007).  First, "the ALJ must determine whether the claimant has

17  presented objective medical evidence of an underlying impairment 'which could reasonably

18  be expected to produce the pain or other symptoms alleged.' " Id. (quoting Bunnell v.

19  Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc)). The claimant, however, 'need not

20  show that her impairment could reasonably be expected to cause the severity of the symptom

21  she has alleged; she need only show that it could reasonably have caused some degree of the

22  symptom.' 'Thus, the ALJ may not reject subjective symptom testimony ... simply because

23  there is no showing that the impairment can reasonably produce the degree of symptom

24  alleged.' " Id. (citations omitted); Bunnell, 947 F.2d at 343. Here, the ALJ found that

25  

26         [8] Dr. Pruginin also lists Plaintiff's GAF ("Global Assessment of Functioning") score as 55. [AR
    339.]  The GAF is a scale ranging from zero to 100, used to rate social, occupational and psychological

27  functioning on a hypothetical continuum of mental health.  Pate-Fires v. Astrue, 564 F.3d 935, 937 (8th
    Cir. 2009); Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. Am. Psychiatric Ass'n

28  1994).   A GAF score of 51 to 60 indicates "moderate difficulty in functioning," not a disabling
    impairment.  Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in
    Federal Court §5:30 (2011) (citations omitted).

1    plaintiff's medically determinable impairments could reasonably be expected to cause the

2    alleged symptoms. [AR 72.]

3          "Second, if the claimant meets this first test, and there is no evidence of malingering,

4    'the ALJ can reject the claimant's testimony about the severity of her symptoms only by

5    offering specific, clear and convincing reasons for doing so.' " Lingenfelter, 504 F.3d at

6    1036 (citations omitted). "In making a credibility determination, the ALJ 'must specifically

7    identify what testimony is credible and what testimony undermines the claimant's

8    complaints.' " Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir.2006) (citation omitted). "[T]o

9    discredit a claimant's testimony when a medical impairment has been established, the ALJ

10   must provide specific, cogent reasons for the disbelief." Orn, 495 F.3d at 635 (citations and

11   quotation marks omitted). "The ALJ must cite the reasons why the claimant's testimony is

12   unpersuasive." Id. (citation and quotation marks omitted). The ALJ may consider factors

13   including: the nature, location, onset, duration, frequency, radiation, and intensity of any

14   pain; precipitating and aggravating factors ( e.g., movement, activity, environmental

15   conditions); type, dosage, effectiveness, and adverse side effects of any pain medication;

16   treatment, other than medication, for relief of pain; functional restrictions; the claimant's

17   daily activities; and "ordinary techniques of credibility evaluation." Bunnell, 947 F.2d at 346

18   (citations omitted). The ALJ may consider: (a) inconsistencies or discrepancies in a

19   claimant's statements; (b) inconsistencies between a claimant's statements and activities; (c)

20   exaggerated complaints; and (d) an unexplained failure to seek treatment. Thomas v.

21   Barnhart, 278 F.3d 947, 958–59 (9th Cir.2002).

22         Here, the ALJ made no finding of malingering.  The ALJ did determine that Plaintiff's

23   subjective complaints about the intensity, persistence and limiting effects of her alleged

24   symptoms "are not consistent with the above residual functional capacity assessment." [AR

25   72.] In support of her credibility determination, the ALJ relied on: (1) failure to follow

26   prescribed treatment from the time of her first pregnancy through the birth of her second

27   child; (2) inconsistencies between plaintiff's daily activities and the "level of functioning . . .

28   alleged by her"; and (3) interpersonal conflicts that do not demonstrate an impairment. [AR

73.]

The ALJ's first reason for discrediting Plaintiff's testimony, that she failed to follow prescribed treatment from the time of her first pregnancy through the birth of her second child, was in error to the extent the ALJ was implying that Plaintiff should have taken Zoloft during her pregnancies.  Orn v. Astrue, 495 F.3d 625, 638 (9th Cir. 2007) (failure to follow prescribed treatment, when there is a good reason not to do so, may not be used as a basis to deny disability benefits).  However, given the other valid reasons for discrediting Plaintiff's testimony, even if the ALJ erred, the error was harmless.  See Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195-97 (9th Cir. 2004) (applying harmless error standard where one of the ALJ's several reasons supporting an adverse credibility finding was held invalid).

The ALJ's second reason for discrediting Plaintiff's testimony is supported by substantial evidence.  The ALJ noted that the Plaintiff's "daily activities include caring for children, attending school and writing children's' books establish a level of functioning greater than that alleged by her." [AR 73.] As noted above, Plaintiff testified that she drives her children to and from different schools every day. [AR 27.] While the children are in school, Plaintiff does chores and runs errands, such as buying food. [AR 27.] She takes her children to the park or to their various activities such as soccer, baseball and ballet. [AR 28, 31.] She helps her son with his homework, makes meals for her children, bathes them and puts them to bed. [AR 28-30.] She uses the computer for emailing, surfing the internet or loading pictures from her camera. [AR 30.] She has taken her children on a trip to Hawaii for her brother's wedding. [AR 34.] Plaintiff also attends a weekly prayer group intermittently [AR 32], and has written several children's books (although she has not published them). [AR 41-41.] The ALJ properly found that these activities were inconsistent with Plaintiff's statements that she was unable to work.  Thomas, 278 F.3d at 958-59 (ALJ may properly rely on inconsistent statements and inconsistencies between a claimant's statements and her daily activities).

Finally, the ALJ found that Plaintiff's "interpersonal conflict" with members of her household seemed to be more at the root of her problems than her bipolar disorder. [AR 73.]

1    Plaintiff testified that she was diagnosed with bipolar disorder in 1996 [AR 37-38], yet was

2    able to work for several years after that while managing her bipolar disorder [AR 38-39].  In

3    fact, the reason Plaintiff stopped working at the end of 2002 or beginning of 2003  was

4    because she was laid off, not because of a disability. [AR 21, 42.]  It was not until Plaintiff

5    was raising two children, separated from her husband [AR 39], and living with numerous

6    relatives at her mother's house that she claims to have become unable to work.  As Dr. Jonas

7    testified, "situational issues" are not the same as bipolar disorder. [AR 55.] Moreover,

8    Plaintiff's bipolar disorder previously had not prevented her from working.  See Bayliss, 427

9    F.3d at 1216 (claimant's limitations had not previously prevented her from completing high

10   school, obtaining college degree, completing nurse's training, and participating in military

11   training); Gregory v. Bowen, 844 F.2d 664, 667 (9th Cir. 1988) (claimant's back impairment

12   had not previously prevented her from working).  Therefore the ALJ properly considered

13   Plaintiff's situational issues in finding that Plaintiff's subjective complaints were not

14   credible.

15          The ALJ's credibility finding is supported by substantial evidence. "If the ALJ's

16   credibility finding is supported by substantial evidence in the record, we may not engage in

17   second-guessing." Thomas, 278 F.3d at 959 (citations omitted). Accordingly, the ALJ did not

18   err.

19                              **IV.  CONCLUSION**

20          After a thorough review of the record and the papers submitted and based on the

21   reasons discussed above, this Court finds the ALJ's decision that Plaintiff could sustain jobs

22   that constitute substantial gainful activity and that exist in significant numbers in the regional

23   and national economies was supported by substantial evidence in the record and was not

24   based on legal error.  Accordingly, this Court recommends Plaintiff's motion for summary

25   judgment be **DENIED** and the Commissioner's cross-motion for summary judgment be

26   **GRANTED**.

27          This Report and Recommendation is submitted to the United States District Judge

28   assigned to this case pursuant to 28 U.S.C. § 636(b)(1).  Any party may file written

objections with the Court and serve a copy on all parties on or before **July 5, 2011**.  The document should be captioned "Objections to Report and Recommendation."  Any reply to the objections shall be filed and served **no later than 10 days after being served with the Objections**.

       **IT IS SO ORDERED.**

DATED:  June 2, 2011

_____
**CATHY ANN BENCIVENGO**
United States Magistrate Judge